The lawyers can step forward. Oh, this one is on video. I apologize. There's nobody here to step forward. All right. So we have- Oh, I stepped forward. He's not here. For the appellant, we have Ms. Casales. Can you hear me okay? Yes. Good morning. Good morning. And Mr. Rosenstein, can you hear me okay? I can. Thank you. All right. So you can proceed. I see that you reserved three minutes for a roll call. Yes. Okay. Thank you. Good morning. Good morning. I represent Clara Leroy, the plaintiff appellant in this matter. Ms. Leroy was a flight attendant with Delta for 17 years and had an unblemished record. But on May 18, 2017, she was called a black bitch by a passenger on a Delta flight to which she was assigned. She subsequently complained to her supervisor on that flight, the pilot, Pilot Carnes, about being called a black bitch and in the complaint has alleged that she told him the racist passenger called her that. In response, he directed her to continue her conversation with the racist passenger. She objected and subsequently caused her ejection from the flight rather than the passenger's ejection from the flight. At the heart of this case is whether her complaint of discriminatory comment by a customer or racist comment by a customer is actionable and constitutes protected activity under the New York City human rights law. What's important to note here is that this is not a Title VII case. It was brought strictly under the New York City human rights law and it was removed by the federal court on the grounds of diversity. The complaint we submit has alleged sufficient facts at this stage of the pleadings to make out a case, plausibly, of retaliation. And the retaliation... Even under the New York City human rights law, she still has to complain about a discriminatory practice by the employer, right? So how do we get the idea that complaining about something a passenger said is complaining about an action by the employer? Right. And this is where this court's decision in SUMA and the courts from the First Department and the lower district come in. And the concern here is that this is imputed to the employer based on the actions of her supervisor. So under SUMA, for example, there was... The supervisor... This court held... Excuse me. The supervisor... I want to be clear on one factual matter that I wasn't clear on from the briefs. When the supervisor asked her to speak to the passenger, was that just... Did he ask the two of them to do it or did he say... What was the idea that he would be there as well, the pilot? That is not clear from the record. My understanding is that there's a jetway, the flight was delayed. Yeah. So she was serving her first class passengers and at some point, he asked her to go out and speak with... Leave the plane, go out on the jetway and speak to the racist customer. It's not clear that he was going to also leave and go there. And in fact, she alleges... She refused to do that, correct? She refused to do that. That's right. And she noted in the complaint, as alleged, that she refused to do it because she did not wish to continue her conversation with the racist passenger. I'm sorry. I'm sorry. I thought she thought that FAA regulations didn't allow her to exit the plane. Wasn't that... Well, that was one ground. But the second ground was that she also did not wish to continue her conversation with the racist passenger. And we also have this evidence that you're saying he used this slur, but then there's also this suggestion that there was a dispute over his stowage of baggage. Well, this is really leading to the second point, which is what defendants have done is they've taken this narrative that was never incorporated in the pleadings. And at this stage in the pleadings, based on Littlejohn and cases that have followed, it seems that what defendants have done is taken their narrative of what happened, taken this extraneous document... The complaint does say that Leroy filed this facts report with her employer. So you do make reference to this report that details her complaint, right? Well, we make... It makes reference that she was directed to write it, but there's no context. She does not allege, and I think this is where the lower court made an issue about, she does not allege in her complaint that she used this facts report, which is really a safety security report, to complain about the discriminatory treatment. What she's alleging is she complained to her supervisor, Carnes, on May 18th at the flight. So you're saying that she complained to Carnes, the captain, about the language the passenger used, but then when she filled out the facts report, which was the official complaint about what happened on the plane, she didn't mention that? She talked more about the baggage dispute? Well, this is... Why would... Well, this is... Yeah, I'm sorry. Why would there be that discrepancy? Well, this is the problem that happens when defendants can attach these documents to the complaint that have not really been incorporated or adopted by the complaint. She makes a passing reference... Well, she did make reference to the facts report in her complaint, but the report on... It does reference the racist comment. I mean, I'm looking at it right now. It does reference that the racist comment was made, but let me just see if I can summarize what your core position is. You're saying, based upon our decision in SUMA, which was under Title VII, obviously New York City human rights law is broader than that, that harassment, racial harassment by a customer can be actionable, and therefore, by her complaining about that, she has a plausible retaliation claim and that any other issues related to their reasons for terminating her are not appropriate at this stage. Is that basically what your position is? That is our position, but what the defendants are doing is they're raising an issue of fact at this early stage in the pleadings by attaching the report. So we're not allowed, for example, my client could say there were several drafts of this report and it was done under the instruction of a supervisor, and if we were allowed to come in, she would also say that she was directed to tone it down. So, you know, all this information would come out in the concepts of discovery, and I can appreciate what the defendant is saying, which is, you know, we don't want to get into this prolonged discovery if the case can be summarily dismissed. Okay, well, let's put aside the report for a second. So just on this logic about SUMA. So in SUMA we said that the university is liable for the activity, for failing to control the activities of students because it has power over students. It has control over them. Why does the airline here have control over the passengers such that you could impute a passenger's conduct to the airline? Well, the defendants raised some factual issues claiming that they don't without any basis, but the truth is, and again this would come out in discovery, there are actions that a pilot can take to eject them. I mean, we just went, we had this en banc decision in Francis versus Kings Park Manor where we said it's just not plausible to say that a landlord has enough control over a tenant that the landlord would be liable for the activities of a tenant such that you could impute a tenant's harassment of another tenant to the landlord. So we decided that just based on the powers of what an average landlord has. So when we think about what an airline can do with respect to a passenger, I suppose an airline can eject a passenger from a flight just like a landlord could perhaps commence eviction proceedings of a tenant. But we've said that that's not enough to impute liability for the harassment. So why would the relationship between an airline and a passenger be different? Well, there's two factors. The first is, you know, this was her workplace. So, you know, our argument is this is akin to a retail store and then there was a number of decisions recited in our brief, and I'll get to them, about what control does a manager have over a customer coming into a retail store. In fact, this is worse because this was an enclosed environment. The plane was delayed and she had to stay in that environment. She couldn't just get up and leave. Chancellor, wasn't SUMA also a hostile work environment case? And that was a situation where, that was the context of SUMA, wasn't it? Well, you're not arguing that. It was, but I'm focusing... Let me just clarify that you're not arguing that this was a hostile work environment. No, and in fact, in SUMA, with all due respect, the court held that the university met its obligations to take corrective action. So all SUMA addressed, though, was the retaliation part and said even there where the employer, I mean, the university took corrective action, the student manager still had a retaliation claim. In this case, the issue is also Karn's response. So Karn's response to her complaint about this passenger and her refusal to go and continue the conversation with him was to eject her and remove her from her employment. I'm sorry, but even under her allegations, is it... So my understanding is she complains about the passenger, at least according to the allegations, she complains about the passenger, and Karn says, okay, let's talk about this on the jetway, and she refuses to go on the jetway, and he ejects her for that reason, right? So isn't the response to the complaint saying, well, let's just step out of the plane and figure out what happened? No, I don't think there's any indication that Karn's was going to join her. I think Karn's was directing with her. You said that's unclear from the record. Well, the question I have is she refused to do what Karn's asked her to do, so in effect she rejected or disobeyed a directive from her employer. Well, yes, but under this court's rulings, under the cases cited in our brief, just a mere objection. I mean, you know, opposing... She didn't say I object, but I'll do it. She refused his directive, and he was her boss. He was, but she refused it on good grounds. One is her view of the FAA obligations, and two, she did not wish to continue discussing this with a racist customer. Okay. That wasn't the reason for her termination in any event, right? Everyone wants to terminate her because she disobeyed the pilot's order, right? She did not get terminated for that. All right. Thank you. I think your time is up. You have three minutes for rebuttal. We'll hear now from Mr. Rosenstein. Thank you. My name is Ira Rosenstein. Morning, Louis. I very much appreciate being up for you today. I'll just start with a couple of clarifications from what we just heard. The reason stated for LeRoy's termination, by Delta at least, was that she failed a random drug test and that she did not appear for a second drug test. So that's in our papers. I guess that's the allegation. That's not really. A lot of things that you have in your papers are not really part of the pleading. It's not normally something that we would consider determining at a motion to dismiss stage whether a plausible case has been made, right, for retaliation. It's fair. We've argued that there are certain references to drug tests. There are references to the drug tests in the complaint. She suggests in paragraphs 26 and going forward. No, she doesn't reference a failure to report to the drug test. Her references are that she did nothing wrong and that she was told she was wrongfully suspended only through your company's narrative of multiple instances and a third time where she refused to show up for the drug test. But I think that's well beyond what we would consider at this stage. Okay. So I will backtrack to another brief clarification. At this point, the board to paragraph 16, which I think is artfully fled and says prior to taking on plain complaints of I like Barnes about a disgruntled passenger who was racist. She doesn't actually assert that she told Captain Barnes that the comment was made. That's not in the pleading. I think that's a parsing of that sentence. I didn't read that sentence that way, to be honest with you. And actually, it's also in the report that you rely on. As I noted, the comment is in there as well. But I don't think you can read paragraph 16 to not allege that the racist comment was communicated to the pilot for purposes of pleading. But let me ask you a fundamental question. What is your legal position with respect to whether this would be an actionable claim or not under the New York City Human Rights Law? In other words, if we could put aside the issue of whether it's one incident or multiple incidents. But let's take the situation with multiple incidents. Assume you had a passenger who flied repeatedly on Delta Airlines who made racist comments to flight attendants. Is it Delta's position that that would not be an actionable, potentially an actionable hostile work environment claim? Or if you complain about it and you get fired, a retaliation claim under the New York City Human Rights Law. Is that your position? No, that's a great question. And I think Judge Walker's question to Appellant was on the money as well. This is not a hostile environment claim. There's a theoretical circumstance, of course, where an employer can be liable to an employee under the employment discrimination statutes based on the acts of third parties. No one could dispute that. That's clearly true. Those claims require those certain standards to be met. There has to be some sort of known conduct that the employer would have been aware of and didn't do anything to stop. So your position, let me just make sure I understand your position. Your position is an employee says this customer made a racist statement to me. And the employer said, it's the first one, the employer says, we don't care about any racist statements. And we're going to fire you for even raising it. You're fired. Your position is there would be no retaliation claim under this New York City Human Rights Law? No, that's not our position. That's a hypothetical circumstance. But in a situation where there is a customer complaint that is or a customer action that creates an actual hostile work environment. But my point to you, it doesn't have to rise to the level of a hostile work environment. The suggestion would be that the employee has to wait until a certain number of those instances in order to complain. Otherwise, he or she has no protection of the New York City Human Rights retaliation laws. If you complain the first time and tell your employer this is what happened and they fire you because of that complaint, you're out of luck. You should have just kept quiet and waited until it happened multiple times. I suggest to you I think that's unlikely to be New York City's interpretation of the human rights laws. I agree. But that's not precisely what I'm saying. What I'm suggesting is that in order to meet the standard on a retaliation case of demonstrating that you engage in protected activity, you have to be able to demonstrate that what you complained of could be discrimination, could be employment discrimination. I don't think you'd disagree that if Delta had a policy of tolerating racist statements by passengers and firing flight attendants who complained about such statements, that that might be a discriminatory policy by the employer. But is there anything in this case that suggests that that was Delta's policy? Right, and that's where I was going. If there is a – if there was – if there's a – in this situation, which the district court based its determination on the facts, but in this particular case, not a hypothetical case where there was a policy of repeated conduct, where it was a store, where there was a sexual assault, where the employer might have pulled out. You probably would have disagreed that even if on the first instance a customer says some discriminatory statement and the employer responds by saying, we don't worry about that and I'm firing you just for complaining about it, that that might be actionable. But I guess I've got two questions about what actually happened in this case. So under one version of events, maybe as alleged in the complaint, it seems like she complained about the statement and then the pilot said, well, let's take this onto the jetway and talk about it. I guess my question is, is that tantamount to tolerating the statement? And then the other one is, based on the facts report, which does mention the statement, but it also says that she – that was not the reason she went to – that they went to the pilot. The reason they went to the pilot was the dispute over the baggage, so that would suggest that he wasn't even responding to that. So I just like – so under either one of those scenarios, does it indicate that Delta had a discriminatory policy of tolerating statements by passengers? Well, no. It clearly – Delta – the pleadings make clear that there was no Delta policy. There was no employment action here. In fact, pleadings make clear that Delta had – Maybe you should – I mean I guess the suggestion is, well, she comes to the pilot and says a passenger has said some racist statement. Why shouldn't the pilot just respond by ejecting the passenger from the flight? Does that have been the response and his failure to do that? Does that indicate a discriminatory policy on the part of Delta? Not a policy on behalf of Delta. Well, an employment action. Not an employment action by Delta at all. No, Delta is – Again, I think the point could be conflated. Delta is – Sorry, I'd like to answer that question. No, let me just – Sorry. Let me just clarify. All right. I'll continue in a second. But Delta is telling her to tolerate the behavior of the passenger. So that does affect the terms of her employment in some sense maybe? Well, I don't think so because I think that what's being conflated here with this series of questions and by Alan's argument is the – what the standard would be to create a – an actual hostile work environment and the standard of trying to create – Under New York City – Protected activity. Correct me if I'm wrong. In the New York City human rights law, in Mahalik, we said the conduct doesn't even need to be severe or persuasive. It's as long as it's unwanted. In that case, it was gender-based conduct. Here it would be race-based conduct. So the question is not whether the Delta policy has been established by Delta. It's whether or not she had a good faith, reasonable belief that she had been subjected to an unwanted race-based comment that she complained to her employer about and that she says she was terminated because of. That's what we're talking about here, right? In fairness, it would have to be – our position is that it would have to be conduct by Delta, not conduct by the employee. And we don't – I don't believe that New York City law precludes dismissal of claims or takes away any standards. It doesn't have to be – the conduct – So I think that an employee still – The conduct does not have to be by Delta. We're going in circles now. Summa has already said that it's actionable based upon third parties if there's enough control. So it does not have to be an action by Delta. If there is such conduct and Delta fails to take remedial action, in this case they're saying no action was taken and she was removed from the flight, that is – it's whether there's a plausible claim under New York City human rights law for that or not. That's the issue. But there – I would point the court – Summa is a case that does not involve retaliation claim, a completely different set of circumstances. But this Court's decisions in Kelly and this Court's decisions in Wu are directly on point. And, you know, this Court has said, and I think appropriately so, that, you know, a belief that something meets the definition of discrimination is something other than what's covered by – you have to – if you're – if an employee raises a concern that Martians are discriminating against them, they may have a good faith belief that that's discrimination. But that doesn't make it discrimination. Okay. So then your claim is that Delta didn't actually engage in discrimination. So maybe you could just explain your argument why it was a reasonable response for the captain to say, let's step onto the jetway and discuss this. Why is that a reasonable response to her complaint? So if a – if you take the – and I don't. But if you take the argument that counsel is making that the captain was actually informed about the comment, as opposed to it having been raised after the termination for – but if you accept that, that he was aware of the comment, all he did was say, let's take this out on the jetway and talk. That's a – I think by any stretch a rational response to a customer complaint by an employer to have a conversation about it. And then an employee's refusal, especially in the industry that we're in, where the captain is literally the captain of the ship and has control, the refusal of a flight attendant to follow instructions, I think, rationally and reasonably leads to that. Where does it – where does it say in the complaint – where does it say in the complaint – The employee is not claiming that she was punished for being – I mean, she had to leave the flight, but there was no other discipline taken. She claims that three months later she was fired, again, implausibly in our view, for that. Where does she say in the complaint that the pilot was going to accompany them? It says after the complaint, the pilot, Karnes, demanded that the plane step out on the bridge with the passenger. I don't know if it's a fair reading of the complaints to suggest the pilot was going to accompany them, right? I don't think that's in the complaint. No, I – All right, so she's – her position is – But I don't think that's an unreasonable thing to require of the employee. Again, even if the employee was – had been subjected to what she claims was the racist comment and she told the pilot, simply having the flight attendant speak to the client, the passenger on the jetway, I don't believe – You want us to decide – – the right level of hostile work environment. You want us to decide as a matter of law that that response was reasonable to tell her to – she claims this passenger has harassed me with a racial comment, and assuming the direction was, you go out on the jetway and speak to him and resolve this, we're going to decide as a matter of law that that was a reasonable response that – under the New York City human rights law to that situation. That would be – No, I think you can decide that, but I think that it would be easier to simply decide that a simple – a simple – the simple comment by the customer can't rise, as Judge Malstrup did, can't rise to the level of actionable employer conduct without meeting the standards that we discussed about the employer having control over the conduct or – The employer's response – the employer's response, at the very least, has to be such to indicate that the employer has a policy of accepting discriminatory statements or subjecting employees to discriminatory treatment. And so even if the employer could have handled it differently, I think your argument would be, well, asking them to step out of the jetway doesn't rise to the level of sanctioning the comment or requiring employees to be subjected to discriminatory treatment, right? Isn't that – Sure. And the employee had the – I mean, in that asking somebody to talk to a passenger is their job. A flight attendant is required to do that. So, again, even if – I think it's totally implausible if the pilot was aware of the comment, but even if we accept that, that it is plausible and it is properly pled, and that it wouldn't be futile to move this case back for all the reasons that we've argued in our motion, I think that that act of asking a customer to – asking a flight attendant to step out of the jetway is not employment discrimination. It does not. I do think that that cannot create a hostile work environment. Excuse me. I just want to ask one other question. When she was asked to go out of the jetway and then refused and then, for whatever reason, was let go, later on, she was kept off the flight. Is that an adverse employment action? Because her pay wasn't changed. She just wasn't – she wasn't allowed to continue on that flight. Yeah, and I think what we run into there in our – She could be reassigned to another flight. She could take a – in other words, it was just a question. How you were going to – I mean, we probably run into complex preemption issues because the pilot does have control over the flight. There are clearly safety issues that are raised in this situation. But I wanted to know what happened to her circumstances of employment. Well, she continued to work. Let me just finish up. Let me finish the question. I'm sorry. I apologize. Was this a demerit? Would it have gone into her record that it was something that would affect her promotion later on or her future as a flight attendant? So there's a great question. It's precisely a – what led to that FACTS report that is in evidence here. So any time there's a dispute on the aircraft, of course, it gets looked into after the fact. And Delta would have reviewed the situation and then determined whether or not either of the parties were at fault for doing something wrong. So it was potentially something that she could have been disciplined for. Whether she was disciplined or not isn't in this record. But in fairness to answer the question, certainly refusing to follow the instructions of the pilot resulting in your being sent home would not be – could conceivably not be a positive thing. And I think – Well, also, she was terminated. She's claiming that the removal was – I mean, she may be claiming that was adverse too. But ultimately, she's claiming she was terminated over this. So that's really the adverse action we're talking about, right? Well, she's claiming that she – she's claiming she was terminated. As I understand it, she's claiming she was terminated because she complained about it, not because of the actual cells. Let me ask you – I want to – the Fourth Circuit – And that's what I think would be impossible. The Fourth Circuit, an en banc case where there were two comments, racist comments, said the following with respect to a retaliation claim. Employees who reasonably perceive an incident to be physically threatening or humiliating do not have to wait for further harassment before they can seek help from their employers without exposing themselves to retaliation. Yeah. I agree with that point by the Fourth Circuit. I think that if she had – if she had engaged in protective activity and if she could state a plausible connection – Well, in that case, they complained about – – accusation. In that case, they complained about two uses of this racist term. So I just don't understand your position. Is it because it was only one instance that it's not – she didn't complain of – it's not protected activity because it was one – complained of one instance? My position is that – is that when you're looking at a third party's conduct, you have to determine whether or not the employer had a basis for being able to protect the employee from that conduct. And the only way that the employer could have had a basis to protect the employee would be if there was repetitive conduct or other complaints. All the cases they cite, which are Hustler-Harman cases, rely on that. Why would that be – why would that be true if it was repetitive conduct? I mean if Captain Clarence had witnessed the incident and knew there was no question that the guy had engaged in racial harassment and then he refused to act on that basis, I don't know, wouldn't that be a problem on the part of the employer? I thought you were saying that under the circumstances, asking for a further discussion would be a sensible response because he didn't witness it. He wanted to figure out what happened, whatever he would have said. But if, in fact, there was no question that there was an incident of racial harassment and he penalized the flight attendant for complaining about it, wouldn't that be a problem? Wouldn't that indicate a discriminatory policy on the part of the employer? Not a policy on the part of the employer. Yeah, and an adverse employment action. I mean it would be a policy in that particular case, I suppose. Again, I think there are scenarios, hypothetically, where a third party's complaint – a third party's actions can be imputed to the employer. But this is not one of those scenarios where there's a single comment that cannot be – could not have been known to the employer in advance and where the employer permitted avenues of address to the employee. That's the standard that's set out in the case law. And the city law does not have – it has a liberal interpretation, but it doesn't have a separate standard for what you need to demonstrate to prove retaliation or a good faith, reasonable belief that you've been discriminated against. She could not, in our view, could not have had a reasonable good faith belief that she was being subjected to employment discrimination based on the customer's comment. And she does not accuse the captain, and she concedes in the complaint, that the captain never acted in a discriminatory fashion. So her own complaint says, I don't believe Captain Hickman-Harris didn't say anything discriminatory. All right. Thank you, Mr. Rosenstein. It's a lot to – thank you. All right. We've gone substantially over the time we have your position. Thank you. Ms. Casales, you have three minutes. Yes. I'd like to – there's a case that was decided in the Southern District, Swiderski v. Urban Outfitters, which is one of the cases that specifically deals with this issue. And on the issue of whether the conduct needs to be repetitive for there to be an onus on the employer to take action, in that case there were two complaints about a customer sexually harassing a retail worker. And one of – the second complaint involved a customer who was never known to the employer. It was the first time the customer had done anything like that. And on the 12 v. 6 motion, the court specifically denied the motion to dismiss, arguing that, you know, even in a situation where the sole allegation between the second customer harassing her was that, you know, he harassed her and no one responded. She didn't even allege that she complained. And the court said that the facts there are sufficiently plausible under the New York City human rights law. But you agree that the employer would need to know about the incident for a lack of response to indicate an adverse action on the part of the employer, right? Right. And we allege – And so in this case where the captain didn't witness the incident, he has a complaint that somebody said – called her a name. And then he says, well, let's step out on the jetway and figure it out. Why is that – why does that indicate the employer is tolerating or accepting or endorsing the actions of the passenger? Because if it wasn't said quite that way, he directed her to go and speak to this customer that she complained was racist. And she specifically objected, not only due to the FAA regulations, but she – so indicating that there is evidence or we could have evidence later on, should this case proceed, to show whether the FAA regulations included that. So your argument is that maybe if the captain had stepped out with them to kind of mediate the dispute, that would be different. But you're suggesting – the captain just said, why don't you two go out and talk it out, and that would be an unacceptable response? Well, I'm not sure – Why wouldn't that be – why wouldn't that be seeking – why wouldn't that be addressing it? He wasn't dismissing it, right? Well, under the city human rights law, I think this is a factual issue that really is suited for later on and not this stage of the proceedings, as to whether this was sufficient. Yeah, but there needs to be – I mean, I understand that there's a factual issue as to liability, but whether the actions of the passenger can be imputed to the employer is a legal question. So what did the employer do here to endorse or adopt or indicate that it had a policy of tolerating the harassment by the passenger? Well, his reaction to her complaint evidences that he was clearly annoyed with – I mean, as is alleged in the complaint, annoyed with that she had complained about the racist comment. And then when she objected, she specifically objected to going out and speaking to a customer who had just called her a black bitch, saying she did not want to – she did not wish to continue the conversation with the racist customer. That in and of itself now indicates that the employer is not just solely trying to mediate something. I mean, it indicates that he's making light of this allegation. Does it make any difference in your mind whether the captain joined them on the jetway or not? I gather the complaint is silent on the question. Suppose the pilot had gone on the jetway to try and mediate. He didn't know anything about what had happened. He'd gotten a third-hand report or second-hand report. He wasn't there when the statement was made, and the pilot steps out on the jetway with the two people to see if the problem can be resolved. You've got a paying customer, and you've also got an employee who claims that she's been insulted badly by a racist comment. Why wouldn't that be a reasonable thing for the pilot to do? Well, if this case proceeded to discovery and the pilot said, look, my intent was to get him to apologize to her, and that was the reason why I asked her to step out. And I may have a different position on this, but that's not – as alleged at this date, that is not – Well, you also – you don't even allege a hostile work environment claim. You allege a retaliation claim. So the issue ultimately in this particular case is simply whether she had a good faith, reasonable belief that she was being subjected to discriminatory conduct as that's defined under New York City law. That's what we're talking about here, right? Right. Not whether she can prove a hostile work environment or not. No, no, and we're not – All right. All right. We have – I don't think that comment alone would suffice. All right. I think we have both sides' positions. That was very helpful. Thank you. We'll reserve the session. Thank you. Have a good day. Thank you. Bye-bye. Thanks.